Entered: September 28th, 2018
Signed: September 28th, 2018

**SO ORDERED**



WENDELIN L. LIPP
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BAKNRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Gregory B. Myers, | * | Case No. 15-26033-WIL |
| | * | Chapter 7 |
| Debtor. | * | |
| | * | |
| ***************************************** | | |
| | * | |
| United States Trustee, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Adversary No. 17-00193 |
| | * | |
| Gregory B. Myers, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**********************************************************************************

### ORDER ENTERING JUDGMENT

Before the Court are the United States Trustee's Complaint to Deny Discharge of Debtor (the

"Complaint") and the Debtor/Defendant's Answer thereto.    The Court held a two-day trial in this

proceeding on May 21-22, 2018, at which time the Court took this matter under advisement.    For

the reasons set forth in the Memorandum Opinion entered contemporaneously herewith, it is, by the

United States Bankruptcy Court for the District of Maryland, hereby

1

**ORDERED**, that judgment is entered in favor of the United States Trustee on Counts I, II,

III and IV of the Complaint, and the Debtor/Defendant shall be denied a discharge pursuant to 11

U.S.C. §§ 727(a)(3), 727(a)(4)(A), 727(a)(4)(B), and 727(a)(5); and it is further

  **ORDERED**, that judgment is entered in favor of the Debtor/Defendant on Counts V and

VI of the Complaint.[1]

cc:  All Counsel
   All Parties
   Chapter 7 Trustee
   All creditors and parties-in-interest

**END OF ORDER**

---

[1] The Complaint contains two causes of action listed as "Count V."   For purposes of clarity, any reference
to Count VI in this Order and the accompanying Memorandum Opinion refers to the cause of action
seeking relief under § 727(a)(6).

2

Entered: September 28th, 2018
Signed: September 28th, 2018



U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BAKNRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Gregory B. Myers, | * | Case No. 15-26033-WIL |
| | * | Chapter 7 |
| Debtor. | * | |
| | * | |
| ***************************************** | | |
| | * | |
| United States Trustee, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Adversary No. 17-00193 |
| | * | |
| Gregory B. Myers, | * | |
| | * | |
| Defendant. | * | |
| * | * | |

**********************************************************************************

### MEMORANDUM OPINION

Before the Court is the United States Trustee's Complaint to Deny Discharge of Debtor

pursuant to 11 U.S.C. §§ 727(a)(2), 727 (a)(3), 727(a)(4), 727(a)(5), and 727(a)(6) (the "Complaint")

and the Debtor/Defendant's Answer thereto. The Court held a trial in this proceeding on May

21-22, 2018, at which time the Court took this matter under advisement. The Court has reviewed

the pleadings, considered the arguments and testimony presented at trial, and examined the exhibits

1

admitted into evidence.  For the following reasons, the Court determines that judgment shall be entered in favor of the United States Trustee on Counts I, II, III and IV of the Complaint, and in favor of the Defendant on Counts V and VI of the Complaint.[1]

## I.    **Findings of Fact**

The following facts are relevant to the issues at hand and are either uncontroverted or are supported by the evidence in this case.[2]  Gregory B. Myers (the "Debtor" or "Myers") filed a voluntary Chapter 11 bankruptcy petition on November 18, 2015.  Myers' initial bankruptcy schedules, which were admitted into evidence as Plaintiff's Ex. No. 2, were filed on December 16, 2015.  Myers' initial Schedule A listed four parcels of real property: (i) 700 Gulf Shore Boulevard, Naples, FL 34102 (the "Naples Property"), Myers' principal residence, which was listed as having a fair market value of $3,500,000.00; (ii) 4505 Wetherill Road, Bethesda, MD 20816 (the "Bethesda Property"), which was listed as having a fair market value of $1,153,900.00; (iii) 147 Silver Laurel Way, Santa Rosa Beach, FL 32459 (the "Silver Laurel Way Property"), which was listed as having a fair market value of $1,350,000.00; and (iv) Lot 6 Seaside 14 Subdivision, Santa Rosa Beach, FL 32459 ("Lot 6"), which was listed as having a fair market value of $1,995,000.00.

Myers' initial Schedule D listed an entity named Serv Trust as having a secured claim in the amount of $151,500.00 secured by Lot 6 and states: "Debtor is Not on the Note, but pledged his interest under the Deed of Trust."   Serv Trust is a trust that was created by Myers' mother for the

---

[1]  The Complaint contains two causes of action listed as "Count V."   For purposes of clarity, any reference to Count VI in this Memorandum Opinion and the accompanying Order refers to the cause of action seeking relief under § 727(a)(6).

[2]  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any conclusions of law constitute findings of fact, they are so adopted.

2

benefit of Myers' five children.  Serv Trust was funded with an initial deposit of $1,000.00 from

Myers' mother.  Myers and Daniel Ring are the co-trustees of Serv Trust.  Serv Trust's asserted

secured claim is based on a Mortgage executed by Myers and his spouse, Barbara Kelly ("Kelly"),

on June 26, 2014, listing $1,000,000.00 as the maximum amount of the secured indebtedness at

any one time (the "Serv Trust Mortgage").  *See* Plaintiff's Ex. No. 18.  The Serv Trust Mortgage

refers to a Credit Agreement executed by Myers and Kelly on June 26, 2014, which provides that

Myers and Kelly promise to pay Serv Trust the principal sum of $1,000,000.00 or however much

has been advanced by Serv Trust to Myers and/or Kelly (the "Serv Trust Credit Agreement" and

together with the Serv Trust Mortgage, the "Serv Trust Loan Documents").  *See* Plaintiff's Ex.

No. 17.  The Serv Trust Credit Agreement provides that all sums advanced by Serv Trust to

Myers and/or Kelly shall be secured by the Serv Trust Mortgage encumbering various properties,

including Lot 6.  The Serv Trust Mortgage states that Myers is not responsible for the amounts

due under the Serv Trust Credit Agreement.  It is undisputed that Myers and/or Kelly received

substantial payments from Serv Trust during the three years preceding Myers' bankruptcy filing.

Plaintiff's Ex. No. 19, which was provided to the United States Trustee by Myers via his former

bankruptcy counsel, is a list of payments Serv Trust allegedly made to either Myers or Kelly

between March 10, 2011, and September 26, 2016.  The payments total $1,152,900.00.

     Myers' initial Schedule I represented that neither Myers nor his non-filing spouse were

employed, and further reflected that Myers' sole source of income was a monthly disability

insurance payment in the amount of $14,450.00.  Myers' initial Schedule I did not attribute any

income to his spouse.

     At Myers' continued 341 meeting of creditors conducted on February 1, 2016 (the "341

Meeting"), the transcript of which was admitted into evidence as Plaintiff's Ex. No. 33, Myers

3

testified under oath to the following.   Myers testified that he was not making any post-petition

mortgage payments on the four properties listed on his initial Schedule A, including a payment of

$3,686.31 that was supposed to be paid into the Walton County Circuit Court's registry for the Silver

Laurel Way Property in connection with foreclosure proceedings for that property.   Myers testified

that Serv Trust has a 50% interest in a Maryland limited liability company named 6789 Goldsboro

LLC ("Goldsboro").   The sole asset of Goldsboro is a parcel of unoccupied residential real property

located in Montgomery County, MD (the "Goldsboro Property").   Myers testified that he did not

know the value of the Goldsboro Property.   Myers and his attorney refused to disclose the name of

the other 50% owner of Goldsboro but Myers stated that the "other 50% interest is owned by a

completely unrelated party."   Myers further testified that the unnamed 50% owner of Goldsboro

paid the entire purchase price for the Goldsboro Property in 2013 or 2014 in the approximate amount

of $1,350,000.00, and made capital contributions into the company, which sums could then be

loaned to Serv Trust "and that money went to the benefit of the beneficiaries of the Trust"— Myers'

children.   He stated: "the Trust can distribute money for anything to their benefit, including

education."   Myers testified that he did not keep a separate account for any funds received from

Serv Trust for his children and stated that some of the distributions made by Serv Trust for the

benefit of Myers' children were placed into Myers' checking account.   Myers testified that he did

not keep a log of all the expenses to which Serv Trust funds were used but he maintained that the

tuition expenses for his five children exceeded any distributions made by Serv Trust.   In response to

the Trustee asking why the income from Serv Trust was not listed on Myers' Schedule I despite the

expenses that Serv Trust paid being listed on Schedule J, Myers' attorney stated that Myers would be

filing Amended Schedules I and J to indicate that the Serv Trust funds were coming into Myers'

household.   Myers acknowledged at the 341 Meeting that he knew he was not permitted to accept

4

any post-petition loans without court approval and he stated he had not accepted any such loans.

Myers filed Amended Schedules I and J on February 29, 2016, which were admitted into evidence as Plaintiff's Ex. No. 3 (hereinafter, the Amended Schedules I and J filed on February 29, 2016, shall be referred to as the First Amended Schedule I and the First Amended Schedule J"). The First Amended Schedule I listed Myers' Disability Insurance income in the amount of $14,500.00, and added two sources of income attributable to Kelly: $246.00 in "net income from rental property and from operating a business, profession, or farm" and $15,000.00 from a "Trust" with the following explanation in response to question 13:

> The income to the Debtor's wife is from a Trust. Income to Debtor's wife is in the sole discretion of the Trustees of the Trust. The income from the Trust is used principally for education expenses of the Debtor's children.

Although the First Amended Schedule I does not name Serv Trust as the "Trust" referenced therein, it is clear from Myers' testimony at the 341 Meeting that Serv Trust was providing the $15,000.00 monthly income attributable to Kelly.

On June 17, 2016, a Consent Order Establishing Deadline for the Debtor to File his Chapter 11 Plan, Timely File Monthly Operating Reports and Remit Quarterly Fees was entered in Myers' bankruptcy case (the "Chapter 11 Consent Order"). The Chapter 11 Consent Order provided that the "Debtor shall file a Disclosure Statement that is reasonably susceptible to approval and a Chapter 11 Plan that is reasonably susceptible to confirmation by September 30, 2016," and further provided that the Debtor shall timely file his monthly operating reports and timely remit quarterly payments to the United States Trustee. *See* Plaintiff's Ex. No. 9.

On October 5, 2016, Myers filed his Disclosure Statement, which was admitted into evidence as Plaintiff's Ex. No. 10. Page 8 of the Disclosure Statement states: "As of the date of the filing of this Disclosure Statement, a Motion to Sell Lot 6, Seaside 14 Subdivision, Santa Rosa

5

Beach, FL 32459 for the contract price of $1,772,500.00 is pending before the Court, which proceeds will fund payments to creditors consistent with the Plan."   Page 9 of the Disclosure Statement reflects that there are five asserted liens against Lot 6, three of which Myers' listed as "disputed" (the disputed liens were held by Seaside III Neighborhood Assoc., Inc., Offit Kurman, and Regions Bank).   The Disclosure Statement lists Serv Trust as having a fourth-priority lien against Lot 6 in the amount of $1,000,000.00.   Serv Trust's lien is not listed as "disputed" in the Disclosure Statement.   The Disclosure Statement did not explain how Serv Trust's alleged lien increased from $151,000.00 as reflected on Myers' initial Schedule D to $1,000,000.00.

On October 18, 2016, the United States Trustee filed a Motion to Convert Case to Chapter 7 or, in the Alternative, to Dismiss Case (the "Motion to Convert").   On November 15, 2016, the United States Trustee conducted an examination of Myers pursuant to Fed. R. Bankr. P. 2004 (the "2004 Examination").   Designated portions of the transcript from the 2004 Examination were admitted into evidence as Plaintiff's Ex. No. 32.   Myers testified under oath at the 2004 Examination that he was no longer receiving monthly disability insurance payments in the amount of $14,450.00 and he believed the last payment he received was in June or July [of 2016] in the approximate amount of $43,000.00.   Myers further testified that he could not recall the amount of loans made from Goldsboro to Serv Trust but that he, as the co-trustee of Serv Trust, would have had to sign off on any loan documents between Goldsboro and Serv Trust and that he had independent authority to determine whether to borrow or loan funds on behalf of Serv Trust. Myers testified that he and Daniel Ring, the other co-trustee of Serv Trust, both authorized Serv Trust to loan funds to Myers and/or Kelly.   Myers disputed that either he or Kelly received distributions from Serv Trust because they are not beneficiaries of Serv Trust.   Rather, Myers testified that any amounts paid from Serv Trust to Myers or Kelly were loans.   He then stated that

6

he could not recall for what purposes several of the checks payable to Kelly from Serv Trust were used. When presented with his First Amended Schedule I, which included the $15,000.00 monthly trust income to Kelly to be used principally for the educational expenses of their children, Myers confirmed that those funds were from Serv Trust, although he stated that he had never seen the explanatory language in response to question number 13 regarding the trust income and how it could be used. He admitted that he signed the declaration relating to the First Amended Schedule I stating that the information provided therein was true and correct, but he said he did not read the statement on the First Amended Schedule I when he signed the declaration and that to the extent the statement was incorrect, it needed to be corrected. He then stated that he disagreed with the statement on the First Amended Schedule I classifying the trust payments as income because he maintained the payments were loan advances. Myers also stated that it was an oversight that Serv Trust did not file a proof of claim in his bankruptcy case.

On November 21, 2016, six days after the 2004 Examination, Myers filed amended Schedules A/B, C, D, E/F, I and J,[3] which were admitted into evidence as Plaintiff's Ex. No. 5. The Amended Schedule D listed Serv Trust as having a claim in the amount of $951,803.96 secured by Lot 6 and omitted the language that "Debtor is Not on the Note, but pledged his interest under the Deed of Trust." The Second Amended Schedule I removed all sources of income and reflected a combined monthly income of $0.00. The Second Amended Schedule J reflected monthly expenses of $26,113.23, a slight reduction from the monthly expenses of $26,235.48 reflected in the First Amended Schedule J.

---

[3] The amended Schedule D filed on November 21, 2016 shall hereinafter be referred to as the "Amended Schedule D" and the amended Schedules I and J filed on November 21, 2016, shall hereinafter be referred to as the "Second Amended Schedule I" and the "Second Amended Schedule J," respectively.

7

On November 22, 2016, Myers filed an Amended Disclosure Statement with an Amended Plan of Reorganization attached thereto as Exhibit A.  The Amended Disclosure Statement with the attached Amended Plan was admitted into evidence as Plaintiff's Ex. No. 12.  The Amended Disclosure Statement provides more information on the Motion to Sell Lot 6 that was pending when the prior Disclosure Statement was filed.  Pages 9-10 of the Amended Disclosure Statement explain that on September 28, 2016, Myers filed a Motion to Sell Lot 6 free and clear of liens and encumbrances (the "Motion to Sell").  The Amended Disclosure Statement further states that this Court granted the Motion to Sell on October 25, 2016, and that the sale closed on October 27, 2016.  The net proceeds of $1,238,598.91, which was the remaining balance after the payment of the first mortgage, realtor commissions and other costs of sale (the "Lot 6 Sale Proceeds"), were deposited into Myers' bankruptcy counsels' escrow account pursuant to the Court's sale order. The Amended Disclosure Statement states that the Lot 6 Sale Proceeds remain subject to the following "disputed secured claims and liens":

| | | |
|---|---|---|
| Seaside III HOA | 8/26/2010 Recorded Notice of Lien | $47,552.00 |
| Offit Kurman, P.A. | 1/13/2014 Recorded Mortgage | $550,000.00 |
| Serv Trust | 6/27/2014 Recorded Mortgage | $951,803.96 |
| Regions Bank | 9/19/2014 Recorded Judgment | $320,879.74 |
| Total | | $1,870,235.70 |

With respect to these "disputed claims and liens," the Amended Disclosure Statement states that Myers has filed Adversary Proceedings to determine the priority and extent of liens against Seaside III Neighborhood Association, Inc., Offit Kurman, P.A. ("Offit Kurman") and Regions Bank.  The Amended Disclosure Statement further states that on November 18, 2016, Offit Kurman filed an Adversary Proceeding to determine the priority and extent of the Serv Trust lien (the "Serv Trust Adversary").  Page 28 of the Amended Disclosure Statement contains the

8

following provisions with respect to Class 12 (general unsecured claims asserted against the

Debtor in the estimated amount of $67,142.27):

> The Class 12 Claims of General Unsecured Claims against the Debtor shall be
> paid in full an amount equal to one hundred percent (100%) of their Allowed
> Claims as follows from the proceeds from the sale of Lot 6, Seaside 14
> Subdivision, Santa Rosa Beach, FL 32459.

> Serve Trust has agreed to subordinate its interest in to[sic] proceeds from the sale
> of Lot 6, Seaside 14 Subdivision, Santa Rosa Beach, FL 32459, if any, in the
> amount of $67,142.27, subject to final allowance of such claims and conditioned
> that the Plan is confirmed by this Court. To the extent that the $67,142.27 exceeds
> the allowed amount of the aggregate of all Class 12 Claims, such funds shall be
> returned to Serv Trust.

Page 29 of the Amended Disclosure Statement contains the following provision with respect to

Class 13 (general unsecured claims asserted against Myers and Kelly in the estimated amount of

$228,817.27):

> Serve Trust has agreed to subordinate its interest in proceeds as a Class 8
> Secured creditor from the sale of Lot 6, Seaside 14 Subdivision, Santa Rosa
> Beach, FL 32459, if any, up to the amount of $228,817.27, subject to (i) final
> allowance of such claims and (ii) conditioned that the Plan is confirmed by this
> Court as proposed. The funds in the total amount of $228,817.27 to which Serv
> Trust would otherwise have exclusive claim shall remain escrowed pending
> final allowance of the dispute[d] Class 13 Claims. If any claim comprising the
> Disputed Class 13 claims is deemed allowed, it will be paid in full from the
> funds escrowed.

Serv Trust also agreed to subordinate its interest in the Lot 6 Sale Proceeds to Regions Bank in the

amount of $128,351.90 on the condition that Myers' proposed settlement with Regions Bank is

approved by the Court.    Page 38 of the Amended Disclosure Statement states that "[s]ince the

Petition Date, the Debtor and his wife have received limited income, assistance from family which

has been used to fund basic living expenses."

On January 27, 2017, Goldsboro filed a Motion for Enlargement of Time to File Proof of

Claim in Myers' bankruptcy case.    This represented the first time Goldsboro made an appearance

in the Debtor's case.   Although the Debtor disclosed Goldsboro's existence at the 341 Meeting,

he did not reveal that Goldsboro had a claim against him during his examination.   The Court

granted Goldsboro's Motion by Order entered on February 15, 2017.   The Motion for

Enlargement of Time to File Proof of Claim and the Order granting the requested relief were

admitted into evidence as Plaintiff's Ex. Nos. 13 and 14, respectively.   The documents attached to

the Motion for Enlargement of Time included: (i) a Promissory Note in the amount of $430,000.00

between Serv Trust as the Borrower and Goldsboro as the Holder dated May 18, 2015, which was

signed by Myers and Daniel Ring as the Trustees of Serv Trust (the "Goldsboro Promissory

Note"); and (ii) a Guaranty Agreement dated May 18, 2015, executed by Myers in which he

personally guarantees to pay to Goldsboro all amounts due under the Goldsboro Promissory Note

(the Goldsboro Guaranty").   The Goldsboro Promissory Note provides that the maturity date

under the Note is the earlier of (i) the date of closing on the sale of the property known as 6789

Goldsboro Road, Bethesda, Maryland 20817, or (ii) December 31, 2017.   Both the Goldsboro

Promissory Note and the Goldsboro Guaranty contain a list of advances made from Goldsboro to

Serv Trust between February 26, 2014 and May 11, 2015, totaling $325,000.00.   The Motion for

Enlargement of Time states that after execution of the Goldsboro Promissory Note, Myers

continued to request loans for Serv Trust from Goldsboro and that Goldsboro refused to make any

additional loans after the principal amount reached $635,000.00.

On January 31, 2017, four days after Goldsboro filed the Motion for Enlargement of Time,

Myers filed another round of amended schedules, including a Second Amended Schedule E/F.

These amended schedules were admitted into evidence as Plaintiff's Ex. No. 6.   The Second

Amended Schedule E/F listed, for the first time, Goldsboro as having an unsecured, nonpriority

10

claim in the amount of $476,395.83 based on a "Guarantee Agreement."   Goldsboro's claim is
listed as contingent, unliquidated and disputed.

On February 1, 2017, Myers filed a Second Amended Disclosure Statement, which was
admitted into evidence as Plaintiff's Ex. No. 15.   The Second Amended Disclosure Statement
discloses the existence of Goldsboro as an unsecured creditor with a potential claim in the amount
of $476,395.83 for which a proof of claim has not yet been filed.   The Second Amended
Disclosure Statement indicates that Myers is going to file an objection to Goldsboro's claim.
Page 27 of the Second Amended Disclosure Statement provides the following treatment of Serv
Trust's claim:

> Serv Trust has agreed to release its lien against the [Lot 6 Sale Proceeds] and to
> waive any right to participate in the treatment of its Claim in the Debtor's
> Bankruptcy Case.   Serv Trust otherwise retains its Claim.   Serv Trust will receive
> no distribution under the Plan.

Two days later, on February 3, 2017, Serv Trust filed a Line Terminating Defense, Withdrawing
Documents, and Consenting to Relief in the Serv Trust Adversary and a proposed form of order.
*See* Plaintiff's Ex. No. 23.   The Order of Judgment, which was subsequently entered by the Court
on February 6, 2017, avoids Serv Trust's lien against the Lot 6 Sale Proceeds "as if such lien never
existed" and disallowed any scheduled or filed claim of Serv Trust in Myers' bankruptcy case.
*See* Plaintiff's Ex. No. 24.

On February 15, 2017, the Court conducted a full evidentiary hearing on the Motion to
Convert, at the conclusion of which the Court rendered an oral ruling converting Myers' case to
Chapter 7.   Myers' failure to list Goldsboro in his initial schedules and his failure to disclose his
personal guaranty of Goldsboro's advances to Serv Trust at the 341 Meeting was a significant
factor in the Court's decision to convert Myers' case.   The United States Trustee filed the
Complaint initiating the instant adversary proceeding on May 18, 2017.

11

## II.     **Analysis**

"Section 727 of the Bankruptcy Code allows debtors to receive a general discharge of their debt in keeping with the Code's purpose of giving honest debtors a fresh start 'unhampered by the pressure and discouragement of preexisting debt.'"  *Wachovia Bank, N.A. v. Voccia (In re Voccia)* 477 B.R. 625, 631 (Bankr. E.D. Va. 2011)(citing *Farouki v. Emirates Bank Int'l, Ltd.,* 14 F.3d 244, 249 (4th Cir.1994)).  "However, provisions enumerated in § 727(a)(1)-(10) prohibit a discharge for those who 'play fast and loose with their assets or with the reality of their affairs.'" *Id.* (citing *Farouki,* 14 F.3d at 249).  These provisions "are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction."  *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987); *see also Cho v. Park (In re Seung Chan Park)*, 480 B.R. 627, 639 (Bankr. D. Md. 2012)("The purpose of the schedules is to ensure that there is adequate information available to the debtor's creditors—there should be no independent duty placed upon the creditors to conduct an investigation to ensure that the information in the schedules and statements is true, accurate and complete.").  "Creditors should not have to 'drag the truth' from the debtor and the debtor should be required to abide by the 'cardinal rule: when in doubt, disclose.'" *Id.* (quoting *In re Halishak,* 337 B.R. 620, 630 (Bankr. N.D. Ohio 2005)).  As is often stated, "the hallmark of every bankruptcy case is transparency—the full, fair and timely disclosure of information that affects the administration of the estate."  *Gordon Properties, LLC v. First Owners' Assoc. of Forty Six Hundred Condominium, Inc. (In re Gordon Properties, LLC)*, 514 B.R. 449, 460 (Bankr. E.D. Va. 2013).

The party objecting to a debtor's discharge bears the burden of proving its objection by a preponderance of the evidence.  *Farouki,* 14 F.3d at 249-250.  "Although the burden may shift to

12

the debtor to provide satisfactory, explanatory evidence once the creditor has established a *prima facie* case, the ultimate burden rests with the creditor." *Id.* A party objecting to discharge need prove only one of the grounds for non-dischargeability under § 727(a) because the provisions of § 727(a) are phrased in the disjunctive. *Id.* at 250. Due to the extreme penalty imposed by section 727, *i.e.,* the denial of discharge, objections to discharge are construed strictly against the objecting party and liberally in favor of the debtor. *See State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996).

Here, the United States Trustee filed the Complaint against Myers seeking to deny him a discharge under sections 727(a)(2), 727 (a)(3), 727(a)(4), 727(a)(5), and 727(a)(6) of the Bankruptcy Code. The Court will address the counts of the Complaint in the order presented therein.

## A.   11 U.S.C. § 727(a)(4)(A)

Section 727(a)(4)(A) of the Bankruptcy Code provides that "[t]he court shall grant the debtor a discharge, unless ... the debtor knowingly *and* fraudulently, in or in connection with the case made a false oath or account." 11 U.S.C. § 727(a)(4)(A)(*emphasis added*). "The purpose of the provision is to insure that debtors provide reliable information to those with an interest in the administration of the debtor's estate." *Kremen v. Slattery (In re Slattery)*, 333 B.R. 340, 344 (Bankr. D. Md. 2005). "In order to be denied a discharge under this section, the debtor must have made a statement under oath which he knew to be false, and he must have made the statement willfully, with intent to defraud." *Williamson v. Fireman's Fund Ins. Co.*, 828 F.2d 249, 251 (4th Cir. 1987). Nevertheless, "the 'problems inherent in ascertaining whether a debtor has acted with fraudulent intent are obvious,' because the debtor is the only person likely to testify and he is unlikely to admit that he acted with fraudulent intent." *Hatton v. Spencer (In re Hatton)*, 204 B.R.

13

477, 483-484 (E.D. Va. 1997)(quoting *Williamson,* 828 F.2d at 252).   Consequently, fraudulent

intent may be established in one of two ways: first, fraudulent intent may be established by

circumstantial evidence, or by inference drawn from a course of conduct.   *Id.* at 484 (citing

*Williamson,* 828 F.2d at 252).   "Thus a 'pattern of concealment and nondisclosure' would permit

an inference of the requisite intent."   *Id.* (citing *In re Ingle,* 70 B.R. 979, 983 (Bankr. E.D.N.C.

1987)).   Second, "courts have determined that a 'reckless indifference to the truth' constitutes the

'functional equivalent of fraud.'"   *Id.* (citing *In re Johnson,* 139 B.R. 163, 166 (Bankr. E.D. Va.

1992)).   "While any single omission or error may be the result of an innocent mistake, multiple

inaccuracies are evidence of 'a pattern of reckless and cavalier disregard for the truth serious

enough to supply the necessary fraudulent intent required by § 727(a)(4)(A).'"   *Wolff v.*

*McChesney (In re McChesney)*, 2012 WL 1856554, *2 (Bankr. D. Md. 2012)(quoting *In re*

*Hatton,* 204 B.R. at 484).   Courts may consider a debtor's education, business experience, and

reliance on counsel when evaluating his/her knowledge of a false statement, but a debtor is not

exonerated by pleading that he or she relied on patently improper advice of counsel.   *Bub v.*

*Rockstone Capital, LLC*, 516 B.R. 685, 695 (E.D.N.Y. 2014)(quoting *Montey Corp. v Maletta (In*

*re Maletta)*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993)).

　　　Once it reasonably appears that the debtor has made a false oath, the burden falls upon the

debtor to come forward with evidence that he has not committed the offense charged or otherwise

provide a satisfactory explanation for the false oath.   *In re Hatton*, 204 B.R. at 482 (citing *In re*

*Johnson*, 139 B.R. at 166); *see also In re Slattery*, 333 B.R. at 344.   Where a debtor subsequently

discloses omitted assets, such later disclosure does not expunge a prior false oath, although courts

have considered a subsequent disclosure "some evidence of innocent intent."   *Rosenbaum v.*

*Kilson (Matter of Kilson)*, 83 B.R. 198, 203 (Bankr. D. Conn. 1988).   "The inference of innocent

14

intent is slight where the debtor has changed his testimony or amended his schedules after the trustee or creditors have already discovered what the debtor sought to hide, or when the change in testimony or amended schedules are precipitated by the trustee's persistence in uncovering the truth."   *Id.*

Here, Count I of the Complaint seeks a denial of Myers' discharge under § 727(a)(4)(A) based on alleged false oaths he made willfully and with the intent to defraud.   Count I alleges that Myers made false oaths on his bankruptcy schedules and while testifying at the 341 Meeting and/or during his 2004 Examination regarding the nature of the payments made by Serv Trust to Myers and/or Kelly.   Count I asserts that Myers committed a false oath by scheduling Serv Trust as a secured creditor on his Schedule D, by failing to list income received by Kelly from Serv Trust on his initial Schedule I, and by failing to schedule Goldsboro as a creditor in his initial schedules. The Complaint also alleges that Myers committed a false oath by increasing Serv Trust's asserted claim on his Amended Schedule D.   Count I further alleges that Myers committed a false oath by testifying at the 2004 Examination that he had never read the statement on the First Amended Schedule I regarding the Serv Trust income received by Kelly.   At trial, the United States Trustee argued that the pattern of motions filed by Serv Trust (at Myers' direction) and Kelly for release of the "surplus" Lot 6 Sale Proceeds was a direct contradiction to Myers' proposed disclosure statement, which provided that Serv Trust would subordinate its interest in the Lot 6 Sale Proceeds to the other creditors holding disputed claims against the proceeds (once the claims were determined) and to pay unsecured creditors in full.   Count I relies on the change in Myers' characterization of monies paid to him and/or Kelly from Serv Trust from disbursements to loan advances, and the substantial discrepancies between the various versions of his Schedule I regarding income from Serv Trust, as evidence of fraudulent intent.

15

Myers consistently argued that any errors or omissions in his schedules were an innocent mistake and were inadvertent. He testified that his guarantee of Serv Trust's obligations to Goldsboro never crossed his mind when he filed his petition and that his execution of the Goldsboro Guaranty had no bearing on his finances because his property is all owned as tenants by the entirety, rendering the Goldsboro Guaranty valueless. Myers testified that he did not include his obligations under the Goldsboro Guaranty in his bankruptcy schedules until the United States Trustee brought the matter to his attention.

The Court agrees with the United States Trustee that Myers knowingly and fraudulently made false oaths in his bankruptcy case sufficient to deny him a discharge under § 727(a)(4)(A). His omissions and misrepresentations were material and served to change the course of his bankruptcy case in critical ways. His failure to schedule Goldsboro, his largest unsecured creditor, until his Second Amended Schedule E/F, which was filed *after* the United States Trustee learned of his obligations under the Goldsboro Guaranty and *after* Goldsboro filed the Motion for Enlargement of Time, was a significant factor in the Court's decision to convert Myers' case to Chapter 7 and is no less significant to the matter at hand. Myers' assertion that his failure to schedule Goldsboro in the first several versions of his schedules was inadvertent is simply implausible. Goldsboro advanced significant sums of money to Serv Trust to enable Serv Trust to make substantial distributions to Myers and/or Kelly for the benefit of their children. Myers, as a co-trustee of Serv Trust, authorized Serv Trust to obtain loans from Goldsboro, and Myers personally guaranteed the repayment of Serv Trust's obligations to Goldsboro a mere six months prior to filing his bankruptcy petition. Plaintiff's Ex. No. 13, which includes the Goldsboro Promissory Note and the Goldsboro Guaranty, reflect that Goldsboro made regular payments to Serv Trust between February 2014 and May 2015. Myers testified that Serv Trust continued to

16

receive funds from Goldsboro after May 11, 2015, and that the last loan Serv Trust received from Goldsboro was in August 2016. Goldsboro's existence was even raised at the 341 Meeting at which Myers explained that Serv Trust is a 50% owner of Goldsboro. Myers explained that the other 50% owner of Goldsboro (who was undisclosed at the time) made capital contributions to Goldsboro that could then be loaned to Serv Trust "and that money went to the benefit of the beneficiaries of the Trust." A review of the 341 Meeting transcript at Plaintiff's Ex. No. 33 shows that the relationship between Myers, Serv Trust and Goldsboro was explored at length and despite rigorous questioning from the United States Trustee, Myers never once mentioned that he was personally obligated to repay all amounts loaned by Goldsboro to Serv Trust.

The timing of the loans from Goldsboro and the execution of the Goldsboro Guaranty, combined with Myers' obfuscation on his liability to Goldsboro at the 341 Meeting, are sufficient to find the requisite fraudulent intent for purposes of § 727(a)(4). The omission defies credulity in light of the ongoing relationship between Serv Trust, Myers, Kelly and Goldsboro, and the substantial sums of money transferred between the parties in the months leading up to the bankruptcy filing and after the filing. It is not believable that he simply forgot to include his largest unsecured creditor in the first several versions of his schedules when he had executed a personal guaranty in favor of that creditor six months prior to filing for bankruptcy and was requesting advances from the creditor up to and after filing his petition. His omission of Goldsboro was more likely strategic considering that Goldsboro continued to make post-petition advances to Serv Trust, which funds were then made available to Myers and/or Kelly to pay for their children's education and household expenses.

The Court further finds that the various versions of Myers' Schedules I and J were misleading and wholly unreliable, particularly with respect to funds received into the household

17

from Serv Trust.  It is undisputed that Serv Trust was established to pay educational and other expenses related to Myers' children.  It is also undisputed that Myers is a co-trustee of Serv Trust with the authority to direct Serv Trust to make payments on behalf of its beneficiaries – the Myers' children.  Myers was adamant at trial that every payment that he and/or Kelly ever received from Serv Trust was for the benefit of his children.  He then argued that he always considered the Serv Trust payments to be loans regardless of how they were classified in his schedules or what was said at the 341 Meeting because neither he nor Kelly is a beneficiary of Serv Trust.  Myers' classification of payments he and/or Kelly received from Serv Trust as "loans" is suspect.  If, as irrefutably testified to by Myers, every payment from Serv Trust to Myers and/or Kelly was for the benefit of their children, then it appears Serv Trust was serving its intended purpose – i.e., providing for Myers' children.  Such payments would not be "loans" to Myers and/or Kelly. They would be distributions to the Trust's beneficiaries.  Regardless of their classification, however, the payments needed to be included on Myers' Schedule I, and the corresponding expenses included on Schedule J because the funds were coming into the household.  However, as detailed below, his schedules never provided an accurate financial picture.

Myers' initial Schedule I does not include any payments from Serv Trust.  Myers' initial Schedule J shows total monthly expenses of $12,738.21 and monthly net income of $1,711.79. The initial Schedule J reflects $0.00 for "childcare and children's education costs."  Myers testified at the 341 Meeting that Serv Trust can "distribute money for anything to [to his children's] benefit" including food, clothes, and tuition.  Myers was adamant that his children's expenses exceeded any amounts ever distributed on their behalf by Serv Trust.  He admitted that he did not keep a log of the expenses he paid on behalf of his children and that he deposited the funds into his own checking account but he maintained that tuition expenses alone exceeded any

18

amounts received from the Trust.   The United States Trustee then explained at the 341 Meeting that Myers' Schedules I and J did not contain any reference to Serv Trust yet the payments from Serv Trust were reflected in Myers' bank statements.   The meeting ultimately concluded with the understanding that Myers was going to file amended Schedules I and J to reflect that the Serv Trust payments "were coming into the household."

Myers filed the First Amended Schedules I and J four weeks after the 341 Meeting.   The First Amended Schedule I differs from the prior version in that it includes income of $246.00 derived from a rental property and income of $15,000.00 from Serv Trust attributable to Kelly to be "used principally for education expenses of the Debtor's children."   The First Amended Schedule I reflects total monthly income of $29,746.00.   The First Amended Schedule J differs from the prior version in several ways: (i) "Food and housekeeping supplies" are increased from $400.00 to $650.00; (ii) "Childcare and children's educational costs" are increased from $0.00 to $5,700.00; (iii) it includes a line item for "Payments to Court Registry for 147 Silver Laurel" in the amount of $3,686.31; and (iv) it includes a line item for the Bethesda Property in the amount of $3,860.96.   The First Amended Schedule J reflects total expenses of $26,235.48 and monthly net income of $3,510.52.

Myers filed the Second Amended Schedules I and J on November 21, 2016.   The Second Amended Schedule I lists $0.00 in income.   The Second Amended Schedule J lists total expenses of $26,113.12 and monthly net income of -$26,113.12.   The Second Amended Schedule J omits two lien payments and a tax payment all attributable to Lot 6 (because the property had been sold); increases the amount attributable to the Bethesda Property to $4,266.00; and adds a line item for the Naples Property in the amount of $5,000.00.   Notably, the Second Amended Schedules I and J were filed the day before Myers filed the Amended Disclosure Statement.   The Amended

19

Disclosure Statement states that Myers and Kelly have received limited income assistance from family, which has been used to fund basic living expenses. (The prior version of the Disclosure Statement contains a similar statement.) More significantly, however, the Amended Disclosure Statement states: "No post-petition payments have been made since the Petition Date" for both the Silver Laurel Way and the Bethesda Properties. This contradicts the expenses listed for those properties on the First Amended Schedule J and the Second Amended Schedule J.

At trial, Myers argued and testified that despite being signed under penalty of perjury, he had not prepared the First Amended Schedule I and that he neither authored nor agreed with the explanation regarding the payments from Serv Trust contained therein. He repeatedly asserted that he did not provide the specific language in several areas of his schedules that were prepared by his former bankruptcy counsel. Myers' testimony was rebutted by his former counsel's testimony that all of the schedules that they prepared and filed on Myers' behalf were based on information provided by Myers and were submitted to Myers for his review and signature prior to filing with the Court. The Court finds Myers' argument that he did author the final language appearing in his schedules meritless. Myers had an ongoing and independent duty to provide accurate and complete information for his schedules regardless of whether counsel assisted in their preparation, and he had a duty to review the schedules to ensure their accuracy. *See Gobindram v. Bank of India*, 538 B.R. 629, 640 (E.D.N.Y. 2015)(holding that a debtor who fails to pay the necessary attention to detail and accuracy when reading his petition and accompanying documents exhibits a reckless indifference to truth under § 727(a)(4)(A)).

Myers' financial situation was a moving target that was never accurately presented in his bankruptcy schedules. His initial Schedules I and J were misleading because they contained no income attributable to Serv Trust and no breakdown of his rental income and expenses. The First

20

Amended Schedules I and J were filed to correct these inaccuracies as a result of discussions at the 341 Meeting. Although the First Amended Schedule I included the payments from Serv Trust, it was also supposed to include a statement of the income and expenses associated with the Silver Laurel Way Property. Instead of a breakdown of the income and expenses, he merely included net monthly income of $246.00 on the First Amended Schedule I and a payment of $3,686.31 on the First Amended Schedule J for "Payments to Court Registry for 147 Silver Laurel." This payment was contrary to his testimony at the 341 Meeting that he was not making the post-petition payments into the Florida court's registry. Furthermore, a Consent Order on Motion for Relief From Automatic Stay entered on November 14, 2016 in Myers' bankruptcy case, which was admitted into evidence as Defendant's Ex. No. 43, indicates that those payments were to commence on December 15, 2016 – almost ten months after the First Amended Schedule J was filed. Myers presented no evidence to confirm that he was making these payments to the Florida court. Similarly, the line item for the Bethesda Property in the amount of $3,860.96 included on his First Amended Schedule J conflicted with his 341 Meeting testimony that he was not making any post-petition payments for that property either.

Myers then filed the Second Amended Schedules I and J in conjunction with his Amended Disclosure Statement. The Second Amended Schedule I reflected $0.00 in monthly income, which is inconsistent with the Amended Disclosure Statement filed the next day in which Myers states he receives limited income assistance from family to fund basic living expenses. Considering that his "basic living expenses" were substantial, it is unbelievable that he had $0.00 coming into the household. It is also inconsistent with bank statements admitted into evidence as Plaintiff's Ex. Nos. 35 and 36, which show that Kelly received rental income of $22,792.96 in 2016 and rental income of $20,391.70 in 2017. Again however, the Second Amended Schedule I

21

did not include any breakdown and simply listed rental income as $0.00.  Similar to his

explanation at the 341 Meeting, Myers testified at trial that the rental income was omitted because

there was no "net rental income" because they were paying approximately $3,800.00 into the

Court's registry for the rental property.  He provided no documentation to prove that he was

paying the asserted $3,800.00 into the Florida court's registry at that time and if he was including

the $3,800.00 payment, then he needed to include the corresponding income for the same property

on Schedule I.  Instead, Myers used his own discretion in deciding what information to include in

his schedules.  This is contrary to the purpose of a debtor's bankruptcy schedules, which are

designed to ensure that the information contained therein is true, accurate and complete.  *See In re*

*Seung Chan Park*, 480 B.R. at 639.  "To allow [a debtor] to use his discretion in determining the

relevant information to disclose would create an end-run around this strictly crafted system."  *Id.*

*(*quoting *In re Weldon*, 184 B.R. 710, 715 (Bankr. D.S.C. 1995)).

　　　For all of these reasons, the Court finds that Myers' schedules contained numerous false

oaths sufficient to deny him a discharge under § 727(a)(4)(A).  Myers' assertion that any

omissions were inadvertent is not credible when the omissions or inaccuracies were this

significant.  Myers is a sophisticated businessman.  His Amended Disclosure Statement and

Second Amended Disclosure Statement both state that Myers was a Mortgage Banker with

Metfund Mortgage Services Corp. for many years and was then an Investment Advisor

Representative for Convergent Wealth Advisors.  The numerous falsities indicate a cavalier

attitude toward his schedules and a reckless disregard for the truth sufficient to deny him a

discharge under § 727(a)(4)(A).  His lack of candor and credibility left his creditors, the United

States Trustee and the Chapter 7 Trustee constantly playing catch up to get an understanding of his

finances and even after multiple amendments to his schedules, his true financial condition was

22

never clear.   The Court further finds that listing Serv Trust as having a secured claim in the amount of $951,803.96 on his Amended Schedule D was a false oath but that discussion is better reserved for Count II below.

## B.      11 U.S.C. § 727(a)(4)(B) *

Count II of the Complaint seeks relief under § 727(a)(4)(B), which provides that "[t]he court shall grant the debtor a discharge, unless ... the debtor knowingly and fraudulently, in or in connection with the case presented or used a false claim."   11 U.S.C. § 727(a)(4)(B).   The burden under § 727(a)(4)(B) is the same as set forth above but instead of making a false oath or account, "the debtor must have presented or used, with intent to defraud, inflated or fictitious claims in a bankruptcy case."   *Bub v. Rockstone Capital, LLC*, 516 B.R. at 694.   The overstatement of a secured claim to create the mistaken belief that the liens against a debtor's property exceed its fair market value is a material falsity and is sufficient to bar a debtor's discharge.   *See Pigott v. Cline (In re Cline)*, 48 B.R. 581, 584–85 (Bankr. E.D. Tenn. 1985).

The United States Trustee alleges that Myers presented a false claim in his bankruptcy case in connection with Serv Trust's alleged lien against the Lot 6 Sale Proceeds.   Specifically, Count II asserts that Serv Trust's secured claim reflected on Myers' Amended Schedule D in the amount of $951,803.96 includes unauthorized post-petition loans in the amount of $212,300.00 from Serv Trust to Kelly for which Myers was jointly liable under the Serv Trust Credit Agreement, and $583,500.00 in payments made prior to the execution of the Serv Trust Mortgage.   The total amount of distributions made by Serv Trust to Myers and/or Kelly after the signing of the Serv Trust Credit Agreement and prior to the bankruptcy totaled $307,100.00.   Lastly, Count II asserts that Myers presented a false claim by pursuing Serv Trust's alleged claim in his bankruptcy case and then agreeing to the disallowance and avoidance of any claim held by Serv Trust.   For this,

23

the United States Trustee relied on the Order of Judgment entered in the Serv Trust Adversary in which Serv Trust agreed to the avoidance of its lien and further agreed that "any scheduled or filed secured or unsecured claim by Serv Trust is disallowed, in its entirety, in this bankruptcy case." *See* Plaintiff's Ex. No. 24.   The Order of Judgment was entered less than three months after Myers filed his Amended Schedule D.

At trial, Myers maintained that the amount of Serv Trust's claim on his initial Schedule D was an inadvertent mistake and that his Amended Schedule D listing the claim as $951,803.96 was accurate.   He relied on the existence of the Serv Trust Loan Documents as proof of the secured nature of Serv Trust's claim and he explained how he determined the amount of the claim.   He testified that $951,803.96 was the total of all loan payments reflected on Plaintiff's Ex. No. 19 up to November 2, 2015, which totaled $940,600.00, plus interest and less a payment made from Kelly to Serv Trust in the amount of $150,000.00.   The $150,000.00 payment from Kelly, which is not reflected in Plaintiff's Ex. No. 19, was from the sale of property owned by Kelly that was included as collateral in the Serv Trust Mortgage ("Lot 3").   *See* Plaintiff's Ex. No. 18. Plaintiff's Ex. No. 22 is a HUD-1 Settlement Statement dated July 29, 2014, a month after execution of the Serv Trust Loan Documents.   The HUD-1 Settlement Statement relates to the sale of Lot 3 and reflects that Serv Trust received $150,000.00 at closing "for payoff of third mortgage."   For the following reasons, the Court finds that the amount of Serv Trust's secured claim set forth on the Amended Schedule D was inflated and therefore, was a false claim and a false oath under § 727(a)(4).

The validity of Serv Trust's asserted lien in the Lot 6 Sale Proceeds has been repeatedly raised throughout Myers' bankruptcy case.   Myers has always maintained that the amount of Serv Trust's secured claim listed in his original Schedule D was an inadvertent error.   As previously

24

stated, Serv Trust never filed a proof of claim in Myers' case to afford parties-in-interest an opportunity to examine the basis for the claim. Rather, Myers, in connection with the sale of Lot 6 and the subsequent filing of his Amended Schedule D, asserted that Serv Trust had a nearly one million dollar lien against the Lot 6 Sale Proceeds as opposed to a lien in the amount of $151,500.00 as asserted in his original Schedule D. He produced the Serv Trust Credit Agreement and Serv Trust Mortgage to support the asserted lien, which covered past and future advances to Myers and/or Kelly. He also provided a list of payments from Serv Trust to Myers or Kelly made via check or wire transfer as reflected in Plaintiff's Ex. No. 19, and he produced various copies of checks and wire transfer receipts evidencing some of those payments, which were admitted into evidence as Plaintiff's Ex. No. 20. Nevertheless, the totals reflected in the two exhibits are inconsistent. The checks and wire transfers contained in Plaintiff's Ex. No. 20 reflect total payments of $801,600.00 to Myers and/or Kelly as of the Petition Date as opposed to the $940,600.00 reflected in Plaintiff's Ex. No. 19, which Myers provided. After accounting for the $150,000.00 payment that Serv Trust received from Kelly in connection with the sale of Lot 3, which Myers factored into his calculation on the Amended Schedule D, the evidence supports a maximum secured claim of $651,600.00 (not including interest). As the United States Trustee made a prima facie showing that the amount of Serv Trust's claim on the Amended Schedule D was false, the burden shifted to the Debtor to come forward with evidence to support the claim. *See In re Hatton*, 204 B.R. at 482. Myers failed to meet that burden. Additionally, the circumstances surrounding the change in Serv Trust's scheduled claim and Serv Trust's subsequent consent to the avoidance of its lien and the disallowance of its claim in the Debtor's bankruptcy case establishes that Myers inflated Serv Trust's claim with fraudulent intent.

The validity and amount of Serv Trust's lien was primed for determination in connection

25

with the Serv Trust Adversary but Serv Trust consented to the avoidance of its lien and the disallowance of its claim prior to the Court even holding a pretrial conference in the matter. Notably, the Order of Judgment resolving the Serv Trust Adversary was entered only days after Goldsboro filed its Motion for Enlargement of Time. This is significant because Goldsboro's appearance in this case changed its entire direction. It rendered Myers' proposal to pay unsecured creditors in full from the Lot 6 Sale Proceeds impossible; it necessitated the filing of an amended disclosure statement and plan; it was a leading factor in this Court's decision to convert this case to Chapter 7; it brought to light the unauthorized post-petition advances Myers was requesting and authorizing on behalf of Serv Trust for which he was personally liable under the Goldsboro Guaranty; it tarnished Myers' credibility; and most significantly for purposes of Count II, it provided an explanation for Myers' ever-changing treatment of Serv Trust's claim throughout his bankruptcy case.

A review of the transfers set forth on Plaintiff's Ex. No. 19 between February 26, 2014 and May 11, 2015, reflect that the timing and amounts of several transfers coincide with the advances Goldsboro asserted it made to Myers as detailed in the Goldsboro Promissory Note and Goldsboro Guaranty, both of which Myers signed. In fact, eight transfers reflected on Plaintiff's Ex. No 19 totaling $320,000.00 are identical in date and amount to the transfers Goldsboro asserts it made to Serv Trust at Myers' request. On direct examination by the United States Trustee, Myers would not admit at trial that any of the transfers listed on Plaintiff's Ex. No. 19 originated with funds from Goldsboro. He also testified that there was ongoing litigation between Serv Trust and Goldsboro so he did not want to characterize the advances made to Serv Trust from Goldsboro as reflected in the Goldsboro Promissory Note as loans. On the other hand, when he testified during his own cross-examination, he testified that his Second Amended Schedule I reflected no income because

26

by then, "there were no more loans from Serv Trust; there were no more loans from Goldsboro, so there was no more income and then I lost my disability in March 2016, and I believe Goldsboro made the last loan in August of 2016." This testimony makes clear that the advances from Goldsboro to Serv Trust were going to Myers and/or Kelly.

This is a catch 22 for the Debtor. If he admits that some of the transfers listed on Plaintiff's Ex. No. 19 originated with funds from Goldsboro, that could affect the litigation between Goldsboro and Serv Trust and perhaps implicate him in the litigation. On the other hand, if the advances from Goldsboro to Serv Trust were later loaned to Myers and/or Kelly and were not included in Plaintiff's Ex. No. 19, then his financial picture before and after the Petition Date is even less accurate. It means he and/or Kelly received significant funds for which he has never accounted. At first blush, the increased claim on the Amended Schedule D may seem inconsequential because Serv Trust ultimately agreed to the avoidance of its lien and disallowance of its claim in Myers' bankruptcy case— no harm, no foul. However, when one considers that Goldsboro may have pursued any of the Lot 6 Sale Proceeds received by Serv Trust pursuant to the Goldsboro Promissory Note, then Myers' treatment of Serv Trust in his case is even more suspect. Within days of the United States Trustee learning about the Goldsboro Promissory Note and Guaranty, Serv Trust agreed to the avoidance of its lien in the Lot 6 Sale Proceeds and instead, Myers and Kelly started pursuing the proceeds based on their joint ownership of the property. In other words, when Goldsboro was not included in the Debtor's bankruptcy case, Serv Trust was asserting a greater lien in the Lot 6 Sale Proceeds because that would enable Myers to access those funds through Serv Trust. Once Goldsboro became active in the bankruptcy case and stated it had a claim for over $600,000.00, Serv Trust agreed to forfeit any claim it had to the sale proceeds and instead, Myers and Kelly pursued the proceeds because Lot 6 had been owned as tenants by the

27

entirety.   Based on these circumstances, the Court finds that Myers fraudulently and intentionally inflated Serv Trust's lien in the Lot 6 Sale Proceeds on his Amended Schedule D and that the false claim is sufficient to deny him a discharge under § 727(a)(4)(B).

## C.   11 U.S.C. § 727(a)(3)

Section 727(a)(3) provides that the Court shall grant the debtor a discharge unless the debtor has "failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case."  11 U.S.C. § 727(a)(3).   Courts have consistently determined that a debtor's books "need not be perfect nor follow any particular system."  *Mercantile Peninsula Bank v. French (In re French),* 499 F.3d 345, 355 (4ᵗʰ Cir. 2007)(quoting *Noroian v. Hern,* 422 F.2d 1092, 1094 (9th Cir. 1970).   Rather, "[t]he test is whether there is available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained."  *Id.* (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d. Cir. 1992)).   "Neither the objecting party nor the Court is required to reconstruct the financial trail; the evidence must be sufficient to account for debtor's financial condition and business transactions without requiring the creditor to reconstruct the history through a maze of transactions and business entities."  *LM Ins. Corp. v. De Caris (In re De Caris)*, 585 B.R. 787, 792 (Bankr. D.S.C. 2018)(quoting *In re Volpe*, 317 B.R. 684, 690 (Bankr. D.S.C. 2003)). "Debtors have an affirmative duty to provide documents that memorialize their financial history for a reasonable period past to present, and neither the trustee nor the creditors is required to ferret out the required records."  *Bakst v. Isles (In re Isles*, 297 B.R. 910, 915 (Bankr. S.D. Fla. 2003).

28

There is no intent requirement under this section; "only a showing that the debtor failed to keep records that a reasonable person would maintain is necessary." *Pereira v. Gardner (In re Gardner)*, 384 B.R. 654, 665 (Bankr. S.D.N.Y. 2008*)(citing Jacobowitz v. The Cadle Co. (In re Jacobowitz),* 309 B.R. 429, 440 (S.D.N.Y. 2004)). "This is demonstrated not by a failure to maintain records in any special form, but by a failure to maintain records that make complete disclosure, which is a condition precedent to granting discharge, possible." *Id. (citing In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936)). Courts consider the following factors when determining the adequacy of records: the complexity and volume of the business; the amount of the debtor's obligations; whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; the debtor's education, business experience and sophistication; the customary business practices for record keeping in the debtor's type of business; the degree of accuracy disclosed by the debtor's existing books and records; the extent of any egregious conduct on the debtor's part; and the debtor's courtroom demeanor. *Id.*

Courts recognize a shifting burden of production under section 727(a)(3). *Id.* Once the objecting party meets its initial burden by showing that a debtor's records are insufficient to ascertain the debtor's financial condition and transactions, the burden of production shifts to the debtor to produce additional credible evidence to rebut the proof of insufficient records, or to justify the absence of records. *Id.*

Here, Count III of the Complaint objects to Myers' discharge under § 727(a)(3) based on his alleged failure to keep or preserve adequate records. Count III alleges that for years prior to filing his bankruptcy case, Myers received $14,500.00 per month from Guardian Life Insurance Company of America ("Guardian"). For the three years prior to the filing of his bankruptcy case, Myers received a total of $522,000.00 from Guardian. During this same time period, Myers

29

and/or Kelly received more than $800,000.00 from Serv Trust.    The Complaint alleges that Myers

failed to provide any documents to explain the dissipation of the more than $1.3 million that Myers

and/or Kelly received from Guardian and Serv Trust during this three-year period.    In addition,

the Complaint states that Myers admitted at a hearing held on May 17, 2017, that he may have

deleted emails received and sent during the pendency of his bankruptcy case, presumably related

to his financial condition or business transactions.    Myers' defense to Count III essentially

consisted of being surprised that he was expected to have records to indicate where his money

went.    He maintained he never had a check register or any bank statements in his possession, and

he stated that he provided a list of expenses to the United States Trustee.

　　　　The Court finds that the United States Trustee met her initial burden of showing that the

Debtor's records were insufficient to ascertain his financial condition.    The Court further finds

that the Debtor failed to adequately justify the absence of any records and failed to provide

credible evidence to rebut the United States Trustee's case.    The records that Myers produced

throughout his bankruptcy case and in connection with this proceeding fell far short of allowing

parties to ascertain his financial condition, particularly when one considers Myers' financial

background and level of sophistication.    This is a debtor who owns several properties with a total

scheduled value exceeding $8 million.    As set forth above, his bankruptcy schedules were

constantly amended, his income and expenses were a moving target, and there was barely a shred

of documentary evidence to indicate how he spent the substantial sums of money received from

Serv Trust and Guardian prior to filing his petition.    Plaintiff's Ex. No. 31 sets forth all of the

documents the United States Trustee maintains Myers produced regarding his finances and this

was not rebutted by the Debtor.    The documents consisted of post-petition bank statements for

two accounts owned by Kelly; documents related to rental income received for one of his

30

properties; some redacted emails; and a pdf titled "check copies for Naples adequate protection payments." These documents were in addition to the bank statements he filed with his monthly operating reports while his case was in Chapter 11, several of which were admitted into evidence. Myers Amended Responses to Interrogatory Numbers 6, 7, 8, 9, and 19, admitted into evidence as Plaintiff's Ex. No. 30, contains a general list of expenses on which he asserts he spent $782,700.00 in Serv Trust loan proceeds, $346,800.00 in benefits from Guardian Life Insurance Company, and $17,575.00 in loan proceeds from his mother. The list includes items such as: real estate taxes; mortgage interest; hazard, flood, wind, life, medical and dental insurance; landscaping; furniture; utilities; cleaning; club dues; travel; tuition; and food.[4] There are no specific amounts that correlate to the itemized list and no supporting documentation was produced to allow the United States Trustee to verify Myers' responses. Myers' Amended Responses to First Request for Production of Documents, also admitted into evidence as Plaintiff's Ex. No. 30, essentially states that bank statements have been previously produced and denies that he has any documentary evidence related to how he and/or Kelly spent or otherwise disposed of the aforementioned sums of money.[5] Other than several monthly operating reports filed while he was in Chapter 11, Myers did not submit any financial or business records into evidence at trial.

At trial, Myers testified several times that sometimes Serv Trust paid his children's expenses directly, including making tuition payments directly to their schools, and sometimes

---

[4] Although Myers listed mortgage interest in his discovery responses, he does not list mortgage payments as one of his expenses. The Court is well aware from presiding over this bankruptcy case that Myers had not made mortgage payments on most, if not all, of his properties for significant periods of time prior to the Petition Date. In fact, the Second Amended Disclosure Statement states that as of the Petition Date, "the Debtor was a party to a number of pending litigation matters, mostly concerning the foreclosure of properties owned by Debtor and Debtor's non-filing spouse." It then lists four foreclosure-related lawsuits to which Myers and/or Kelly are parties.

[5] The Court notes that these responses were provided after the Court ordered Myers to provide amended answers to the United States Trustee's discovery requests and to produce a privilege log to support his claim of attorney-client privilege in response to nearly every question propounded. *See* Plaintiff's Ex. No. 29.

Serv Trust would make payments to Myers and/or Kelly to pay for the children's expenses.

When testifying on the second day of the trial, Myers "guestimated" how much money he spent on

the aforementioned expense categories during the three years prior to filing for bankruptcy. He

testified that his children's tuition expenses alone exceeded $180,000.00 a year. He estimated

that he spent approximately $38,000.00 a year on taxes and insurance for the Naples Property. He

estimated that he paid $50,000.00 a year on past-due real property taxes for his other properties.

He testified that he spent close to $60,000.00 a year at Giant to feed his family. He testified that

insurance on all of his properties was probably $30,000.00 a year, and the list went on. Myers

then argued during his closing that although he did not put any bills into evidence, the Court has

seen his bills at some point and that he provided the names of all of his children's schools. He

maintained that he never had possession of any prepetition bank statements and that he did not

keep a check register and then argued that bank statements were produced. No pre-petition bank

statements were admitted into evidence, however, and the United States Trustee was adamant that

she only received post-petition bank statements for accounts owned by Kelly.

The United States Trustee met her burden that the Debtor's records were insufficient. The

scant documents Myers produced gave no indication of how he spent over a million dollars in the

three years prior to filing for bankruptcy and were wholly inadequate given the complexity of his

real estate holdings, his business experience, the enormity of his debt, and the sums of money

received. The burden then shifted to Myers to produce credible evidence to rebut the proof of

insufficient records, or to justify the absence of any records. Myers completely failed to meet his

burden. He failed to produce any documentary evidence showing where the money went and his

unsubstantiated trial testimony was nothing more than estimations of his expenses over a

three-year period. His courtroom demeanor could be described as indignant that he even had to

explain where his money went.   There was no way for the United States Trustee or any other party

in interest to verify that he paid for the expenses he testified to or whether Serv Trust or a family

member paid his expenses directly.   His word on where the money went was simply insufficient

under the circumstances of this case.   He had an affirmative duty to provide documents that

memorialized his financial history for a reasonable period of time prior to bankruptcy and he failed

to do so.   Most, if not all, of the expenses that he testified he paid could have been proven with

minimal effort on his part.   Myers chose to file for bankruptcy, yet he did not want to be

inconvenienced with the obligations of a debtor in bankruptcy.   Importantly, his lack of

documentation also made it impossible to determine whether there were any avoidable transfers

that could have been pursued in his bankruptcy case.   For these reasons, the Debtor shall be

denied a discharge pursuant to 11 U.S.C. § 727(a)(3).

### D.   11 U.S.C. § 727(a)(5)

Section 727(a)(5) provides that the Court shall grant the debtor a discharge unless "the

debtor has failed to explain satisfactorily, before determination of denial of discharge under this

paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."   Section

727(a)(5) gives a court broad power to decline to grant a discharge in bankruptcy where the debtor

does not adequately explain a shortage, loss, or disappearance of assets.   *In re Martin*, 698 F.2d

883, 886 (7th Cir. 1983).   There is no requirement under § 727(a)(5) that a debtor act fraudulently

or intentionally.   *See Aoki v. Atto Corp. (In re Aoki),* 323 B.R. 803, 817 (1st Cir. B.A.P. 2005).

Rather, the initial burden is on the objecting party to produce evidence establishing the basis for

his objection, at which point the burden shifts to the debtor to explain satisfactorily the loss or

deficiency of assets.   *Id.*   The debtor's explanation must be "reasonable and credible so as to

satisfy the court that the creditors have no cause to wonder where the assets went."   *Farouki v.*

*Union Bank of the Middle East, Ltd. (In re Farouki),* 133 B.R. 769, 777 (Bankr. E.D. Va. 1991).

"To be successful, the explanation must be corroborated and the corroboration must be sufficient

'to eliminate the need for any speculation.'" *Harrington v. Simmons (In re Simmons),* 525 B.R.

543, 548 (1st Cir. B.A.P. 2015), *aff'd,* 810 F.3d 852 (1st Cir. 2016)(citing *In re Aoki,* 323 B.R. at

817). "[D]ischarge will be denied when a debtor makes only a vague evidentiary showing that the

missing assets involved have been used to pay unspecified creditors, or where the debtor fails to

provide corroborative documentary evidence to confirm his explanation." *In re Aoki,* 323 B.R. at

817-18.

Count IV of the Complaint objects to Myers' discharge under § 727(a)(5) for his alleged

failure to explain satisfactorily the dissipation of the more than $1.3 million that he and Kelly

received from Guardian and Serv Trust during the three years prior to the filing of his bankruptcy

petition. As with Count III, the United States Trustee argued that the only evidence Myers

provided during discovery was a list of general expenses that he claimed he may have paid with the

money. Again, the United States Trustee argued that Myers failed to provide any evidence to

corroborate his vague statements — not a tuition bill, not a utility bill, not a check, not a check

register.

The facts and analysis set forth with respect to Count III apply equally here and need not be

reiterated. It suffices to say that Myers failed to meet his burden as to Count IV in the same way

he failed to meet his burden as to Count III. There is simply no way for the Court to determine

with any accuracy how Myers dissipated more than $1.3 million during the three years preceding

his bankruptcy filing. There was no evidence of what bills or expenses he paid or whether certain

expenses were paid directly from Serv Trust or Myers' family members. Instead, Myers offered

vague and uncorroborated estimates of his expenses during the three years prior to his bankruptcy

34

filing. This is insufficient to overcome the United States Trustee's case. *See In re Aoki,* 323

B.R. at 817-18. Accordingly, Myers will be denied a discharge pursuant to 11 U.S.C. § 727(a)(5).

**E.     11 U.S.C. § 727(a)(2)**

Section 727(a)(2) provides:

The court shall grant the debtor a discharge, unless--

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer
of the estate charged with custody of property under this title, has
transferred, removed, destroyed, mutilated, or concealed, or has permitted to
be transferred, removed, destroyed, mutilated, or concealed--

(A) property of the debtor, within one year before the date of the filing

of the petition; or

(B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2). To bar a debtor's discharge under section 727(a)(2), the plaintiff must

prove each of the following four elements by a preponderance of the evidence: (1) the debtor

transferred, removed, destroyed, mutilated or concealed, (2) his or her property, (3) within one

year of the bankruptcy petition's filing, (4) with the actual intent to hinder, delay, or defraud a

creditor. *Id.* Because the fourth element is worded in the disjunctive, it is not necessary to prove

fraudulent intent in order to deny a discharge. *Consumers United Capital Corp. v. Greene (In re*

*Greene),* 202 B.R. 68, 73 (Bankr. D. Md. 1996).

Count V of the Complaint alleges that Myers, with the intent to hinder, delay or defraud

creditors of the estate, transferred to Serv Trust additional equity in the Lot 6 Sale Proceeds by

increasing the amount of Serv Trust's claim as a result of pre and post-petition transfers of funds to

Myers and/or Kelly. Count V also alleges that Myers, with the intent to hinder, delay or defraud

creditors, transferred estate assets to or for the benefit of his children and transferred assets to pay

his and Kelly's joint creditors to the detriment of Myers' sole creditors. Lastly, Count V alleges

35

that Myers transferred assets to various attorneys retained by Kelly who also represented Myers'

interests.   At trial, the United States argued that Myers also violated § 727(a)(2)(A) by concealing

the fact that he guaranteed the loans to Serv Trust from Goldsboro.   The United States Trustee

recognized that although Myers' obligations to Goldsboro were not an asset, she argued that his

concealment of the obligations severely prejudiced his creditors.

The United States Trustee does not prevail on Count V.   There was insufficient evidence

to conclude that Myers transferred estate assets to or for the benefit of his children or that he

transferred assets to the attorneys retained by Kelly or to his joint creditors with the intent to

hinder, delay or defraud creditors.   Inflating Serv Trust's alleged lien on his Amended Schedule D

did not result in any increased distribution to Serv Trust in his bankruptcy case.   Moreover, his

guaranty of Serv Trust's obligations to Goldsboro was not an asset of his bankruptcy estate.   It

was an unsecured liability.   For these reasons, judgment is awarded in Myers' favor on Count V

of the Complaint.

**F.**   **11 U.S.C. § 727(a)(6)**

Under 11 U.S.C. § 727(a)(6)(A), a bankruptcy court "shall grant the debtor a discharge

unless the debtor has refused to obey any lawful order of the court, other than an order to respond

to a material question or to testify."   11 U.S.C. § 727(a)(6)(A).   "The term used in § 727(a)(6)(A)

is 'refused' not 'failed.'"   *Smith v. Jordan (In re Jordan)*, 521 F.3d 430, 433 (4th Cir. 2008).

"Accordingly, the Court must find that the Debtors' lack of compliance with the relevant court

order was willful and intentional."   *Id.*   "The party objecting to discharge satisfies this burden by

demonstrating the debtor received the order in question and failed to comply with its terms."   *Id.*

Such a showing then imposes upon the debtor an obligation to explain his non-compliance.   *Id.*

A debtor's pre-conversion refusal to obey a lawful order of the court may support the denial of

36

discharge under section 727(a)(6).   *See Standiferd v. United States Trustee (In re Standiferd)*, 641 F.3d 1209, 1215 (10th Cir. 2011).

Count VI objects to Myers' discharge under 727(a)(6) for his alleged refusal to comply with the Consent Order Establishing Deadline to File Chapter 11 Plan, Timely File Monthly Operating Reports, and Remit Quarterly Fees (the "Chapter 11 Consent Order") entered while he was in Chapter 11.   Specifically, Count VI asserts that Myers failed to timely file his monthly operating reports, failed to timely file a disclosure statement and plan of reorganization reasonably susceptible to confirmation, and then had to file a second amended plan and disclosure statement when it was revealed that Goldsboro was a creditor.   The United States Trustee admitted that the failure to obey a court order or to comply with deadlines is typically raised as a basis for converting a case but she felt that Myers' refusal to comply with the Chapter 11 Consent Order was so intentional that it is sufficient to deny him a discharge.

The Court agrees that Myers failed to comply with the requirements of the Chapter 11 Consent Order.   By itself, however, this is insufficient to deny him a discharge under § 727(a)(6). Myers' case was converted to Chapter 7 as a result of his noncompliance with the Chapter 11 Consent Order but his noncompliance does not rise to the level of warranting the denial of his discharge.   Accordingly, the relief sought under Count VI of the Complaint is denied.

### III.   Conclusion

For these reasons, judgment shall be awarded in the United States Trustee's favor on Counts I through IV of the Complaint and Myers shall be denied a discharge.   Judgment is entered in Myers' favor as to Counts V and VI of the Complaint.   An Order consistent with this Memorandum will be entered forthwith.

cc:    All Counsel
       All Parties
       Chapter 7 Trustee
       All creditors and parties-in-interest

**END OF MEMORANDUM**